UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EDWARD A. CANIGLIA,          )
    Plaintiff,          )
                )
                )
v.          )          C. A. No. 15-525-JJM-LDA
                )
ROBERT F. STROM as the Finance Director )
of THE CITY OF CRANSTON, THE CITY          )
OF CRANSTON, COL. MICHAEL J.          )
WINQUIST in his individual capacity and          )
in his official capacity as Chief of the          )
CRANSTON POLICE DEPARTMENT,          )
CAPT. RUSSELL HENRY, JR., in his          )
individual capacity and in his official          )
capacity as an officer of the CRANSTON          )
POLICE DEPARTMENT, MAJOR ROBERT )
QUIRK, in his individual capacity and in his )
official capacity as an officer of the          )
CRANSTON POLICE DEPARTMENT, SGT. )
BRANDON BARTH, in his individual          )
capacity and in his official capacity as an          )
officer of the CRANSTON POLICE          )
DEPARTMENT, OFFICER JOHN          )
MASTRATI in his individual capacity and in )
his official capacity as an officer of the          )
CRANSTON POLICE DEPARTMENT,          )
OFFICER WAYNE RUSSELL in his          )
individual capacity and as an officer of the          )
CRANSTON POLICE DEPARTMENT,          )
OFFICER AUSTIN SMITH in his individual )
capacity and in his official capacity as an          )
officer of the CRANSTON POLICE          )
DEPARTMENT, and JOHN and JANE          )
DOES NOS 1-10, in their individual          )
capacities and in their official capacities as          )
officers of the CRANSTON POLICE          )
DEPARTMENT,          )
    Defendants.          )

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

This case brings to the forefront the constitutionality of police conduct when officers are not acting in their law enforcement or investigatory capacity, but aiding individuals out in the community. Edward Caniglia's wife called Cranston police for assistance when she became concerned for her husband's health and safety. Police arrived at the Caniglia's home, spoke to both Mr. and Mrs. Caniglia, and ultimately decided to send Mr. Caniglia in a Cranston rescue for a well-being check at Kent Hospital and to remove from the home the guns that he legally possessed.

Mr. Caniglia filed this lawsuit and both he and the City have filed cross-motions for summary judgment. The City moves (ECF No. 45) on these counts: Count I – Rhode Island Firearms Act; Count II – Second Amendment/Article I, § 2 of the Rhode Island Constitution; Count III – Fourth Amendment/Article 1, § 6 of the Rhode Island Constitution; Count V – Equal Protection; Count VI – Rhode Island Mental Health Law; and Count VII – Conversion, and claims for Declaratory and Injunctive Relief. Mr. Caniglia has cross-moved (ECF No. 43) on Counts III, VI, and VII and also on Count IV – Due Process, and the City's immunity and community caretaking function defenses.

I.     FACTS

On August 20, 2015, Mr. Caniglia and his wife had an argument in their home in Cranston, Rhode Island.  ECF No. 55 at ¶ 1.  Mrs. Caniglia asked her husband what was wrong, and he responded by going into their bedroom and returning with a gun; he threw it on the table and said, "why don't you just shoot me and get me out of my misery." *Id.* at ¶ 3.  Mrs. Caniglia was shocked by her husband's behavior and threatened to call 911.  *Id.* at ¶¶ 5-6.  Mr. Caniglia left the home.  *Id.* at ¶ 7. Mrs. Caniglia did not call 911.  *Id.*

Mrs. Caniglia hid the gun between the mattress and box spring in their bedroom.  *Id.* at ¶ 8.  She then realized that the gun had not been loaded because she saw the magazine under the mattress.  *Id.* at ¶ 9.  She moved the magazine to a drawer.  *Id.*  She hid the gun and magazine because she was worried about her husband's state of mind.  *Id.* at ¶ 11.  When Mr. Caniglia returned to their home, the couple continued to fight, and Mrs. Caniglia left to spend the night at a hotel.  *Id.* at ¶ 14.

The next morning, Mrs. Caniglia tried to reach Mr. Caniglia by phone, but he did not answer.  ECF No. 59 at ¶ 62.  She became worried; she was afraid that he would do something with the gun.  *Id.* at ¶ 63.  She called Cranston police and asked them to make a well call.[1]  ECF No. 55 at ¶16.  She also asked for an escort back to

---

[1] Mrs. Caniglia testified that the police officers' actions were not what she expected.  She wanted an escort home and she and the police would knock on the door and when her husband answered she would know he was okay, and "that we would talk, and if things were fine, the officer would leave."  ECF No. 59 at ¶ 142.

her home to check on Mr. Caniglia. ECF No. 59 at ¶¶ 63-64. Officers John Mastrati, and Austin Smith, and Sargent Brandon Barth arrived at the hotel to speak with Mrs. Caniglia. ECF No. 55 at ¶ 19. She told them about the gun and what she did with it and the magazine and about what Mr. Caniglia said during their argument. *Id.* at ¶ 20. She told them that she was concerned about her husband's safety and about what she would find when she got home; she was worried about him committing suicide. *Id.* at ¶ 22.

Officer Mastrati called Mr. Caniglia and asked to speak with him at his home. ECF No. 59 at ¶ 66. He told Mrs. Caniglia that her husband sounded fine, but instructed her to follow them to the home, and to stay in the car. *Id.* at ¶ 67. The officers spoke with Mr. Caniglia on his back porch. *Id.* at ¶ 69. Mr. Caniglia told Officer Mastrati that he brought the gun out during an argument with his wife, that he was sick of arguing with her, and that he told his wife "just shoot me" because he "couldn't take it anymore." ECF No. 55 at ¶¶ 26, 29. He was calm for the most part and told Officer Mastrati that he would never commit suicide. ECF No. 59 at ¶¶ 70-71. He seemed normal during that encounter. *Id.* at ¶ 80. When officers asked about his mental health, he told them it was none of their business. *Id.* at ¶ 82.

Mrs. Caniglia arrived at the house and the officers told her she could come in. ECF No. 55 at ¶ 31. Mr. Caniglia asked her why she called the police and she told him that she was worried about him. *Id.* at ¶ 33. Based on his conversations with Mrs. Caniglia, Officer Mastrati was concerned about Mr. Caniglia's suicidal thoughts and that he was a danger to himself. *Id.* at ¶¶ 36-37. Sargent Barth, who was in

charge at the scene, also considered Mr. Caniglia's statement that his wife should shoot him as a suicidal statement. *Id.* at ¶ 38.

A rescue from Cranston Fire Department responded to the scene. Richard Greene, a rescue lieutenant, remembers little about the call but that police told him that they recovered a gun from the scene and that Mr. Caniglia asked his wife to shoot him. ECF No. 59 at ¶ 103. Officer Greene told Mr. Caniglia that he was taking him to Kent Hospital, and he went. *Id.* at ¶¶ 105-106. Mr. Caniglia disputes the officers' characterization that he went voluntarily because he says he only went so that the officers would not take his guns, but there is no evidence that Mr. Caniglia's submission to Cranston rescue was involuntary. ECF No. 65 at ¶ 70. A physician and a nurse examined him, and he was evaluated by a social worker. ECF No. 59 at ¶ 121. The hospital discharged him the same day. *Id.*

Sargent Barth made the decision to seize Mr. Caniglia's guns,[2] which Captain Henry approved based on the assertion from the officers at the scene who felt it was reasonable to do so based on Mr. Caniglia's state of mind. ECF No. 55 at ¶ 41; ECF No. 59 at ¶ 87. Captain Henry was concerned that if the guns remained in the home, Mr. Caniglia and others could be in danger. ECF No. 55 at ¶ 42. After Mr. Caniglia left the home, Mrs. Caniglia showed the police where the guns and magazines were kept in the bedroom and garage and the officers removed them from the premises.

---

[2] There is a dispute over what the police said to Mr. and Mrs. Caniglia about seizing the guns – the Caniglia's say that the police told Mrs. Caniglia that her husband approved the seizure and that if Mr. Caniglia went to the hospital for an evaluation, they would not take the guns – but that dispute is not material because ultimately, they took the guns. ECF No. 59 at ¶¶ 85-86.

*Id.* at ¶ 40. The parties dispute the assertion that Mrs. Caniglia wanted the guns removed, but it is undisputed that she pointed out where the guns were and allowed the officers to remove them. ECF No. 59 at ¶¶ 113-114.

A few days later, Mrs. Caniglia went to the Cranston Police Department to retrieve her husband's guns. *Id.* at ¶ 122. After being informed that she needed a copy of the police report and such a request required a captain's approval, she complied and waited only to be told a few days later that her request was denied, and she needed to get a court order. *Id.* at ¶¶ 122-123. A month later, Mr. Caniglia tried to get his guns back from Cranston Police and they told him that they were not going to release them. *Id.* at ¶ 125. Mr. Caniglia's attorney sent a letter to Chief Michael Winquist requesting that the police return the guns to no avail. *Id.* at ¶ 126. After filing this lawsuit, the police gave Mr. Caniglia his guns back without a court order. *Id.* at ¶¶ 133-134. Cranston Police did not prevent Mr. Caniglia from buying or possessing any new guns during this time period. ECF No. 55 at ¶ 46.

II.   STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome.

*URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education*, 915 F. Supp. 1267, 1279 (D.R.I. 1996).

The analysis required for cross-motions for summary judgment is the same. *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009) ("The presence of cross-motions neither dilutes nor distorts this standard of review").  In evaluating cross-motions, the court must determine whether either party is entitled to judgment as a matter of law based on the undisputed facts. *Id.*

## III.   ANALYSIS

The Court will begin by discussing the motions on Mr. Caniglia's federal claims.  The Court will first discuss Count III, which alleges that the City unlawfully seized him and his guns in violation of the Fourth Amendment, then Count II, which alleges that the City violated Mr. Caniglia's rights under the Second Amendment by taking his guns, and then Count IV which is a claim that the City violated due process by failing to afford him any process for the return of his guns.  The Court will also address the City's asserted immunity and defenses.  Finally, the Court will turn to Mr. Caniglia's claims under Rhode Island common and statutory law, Counts I, VI, and VII.

### A. Count III – Fourth Amendment

Both Mr. Caniglia and the City have moved for summary judgment on his Fourth Amendment search and seizure claim.  In this claim, Mr. Caniglia alleges that the City violated his Fourth Amendment right to be free from unreasonable searches and seizures by taking his guns from his home without a warrant and requiring him

to submit to a mental health evaluation. ECF No. 51 at ¶ 78. The City argues that it is entitled to summary judgment because the officers' behavior was reasonable and consistent with its duty to protect the public. The Court will first look at the relevant Fourth Amendment law as well as the parameters of the community caretaking function and qualified immunity defenses that the City invokes.

### 1.  Fourth Amendment Law

Generally, Fourth Amendment jurisprudence talks about searches and seizures in terms of arrests, investigatory stops, or inventory searches. *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009) ("A detention at the hands of a police officer constitutes a seizure of the detainee's person and, thus, must be adequately justified under the Fourth Amendment."); *United States v. Coccia*, 446 F.3d 233, 237-38 (1st Cir. 2006) ("[A] law enforcement officer may only seize property pursuant to a warrant based on probable cause describing the place to be searched and the property to be seized."). But here, the City argues that its police officers did not violate Mr. Caniglia's constitutional rights because they neither stopped nor arrested him for law enforcement purposes, but detained him and seized his guns in furtherance of their duties under the community caretaking function. The City moves for summary judgment on this defense and also on qualified immunity. Mr. Caniglia argues that he is entitled to summary judgment because it is undisputed that his Fourth Amendment rights were violated and that this exception does not apply here because it has only been sanctioned as an exception in cases involving seizures and searches of vehicles, not homes.

## 2. Community Caretaking Function

"The Supreme Court recognized several decades ago that '[l]ocal police officers,

unlike federal officers, frequently ... engage in what, for want of a better term, may

be described as community caretaking functions.'" *United States v. Gemma*, 818 F.3d

23, 32 (1st Cir. 2016) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "Apart

from investigating crime, police are 'expected to aid those in distress, combat actual

hazards, prevent potential hazards from materializing and provide an infinite variety

of services to preserve and protect public safety.'"[3] *Gemma*, 818 F.3d at 32 (quoting

*United States v. Rodriguez–Morales*, 929 F.2d 780, 784–85 (1st Cir. 1991)); *Cady*, 413

U.S. at 441 (The community caretaking function is "totally divorced from the

---

[3] Mr. Caniglia correctly points out that courts are split about whether the community caretaking function standard the United States Supreme Court first set forth in *Cady* in the vehicle context also applies to searches of a home. *See, e.g., Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010); *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994); *United States v. Erickson*, 991 F.2d 529, 532 (9th Cir. 1993); *United States v. Pichany*, 687 F.2d 204, 207–09 (7th Cir. 1982); *Hawkins v. United States*, 113 A.3d 216, 222 (D.C. 2015). The Fifth and Eighth Circuits have applied the community caretaking function to warrantless searches of the home, *see United States v. York*, 895 F.2d 1026, 1029 (5th Cir. 1990); *United States v. Quezada*, 448 F.3d 1005, 1007–08 (8th Cir. 2006). The Sixth Circuit has ruled both ways. *Compare United States v. Rohrig*, 98 F.3d 1506, 1521–25 (6th Cir. 1996), with *Goodwin v. City of Painesville*, 781 F.3d 314, 331 (6th Cir. 2015) and *United States v. Williams*, 354 F.3d 497, 508–09 (6th Cir. 2003). The First Circuit has not had occasion to rule either way on this question. *MacDonald v. Town of Eastham*, 745 F.3d 8, 13-14 (1st Cir. 2014). But given the court's recognition of the validity of police caretakers who "combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety[,]'" *Gemma*, 818 F.3d at 32 (quoting *Rodriguez–Morales*, 929 F.2d at 784–85), and the reality that these services could be required not only in vehicles, but also in homes as well, it appears that the community caretaking defense could be applied in a home, depending on the facts of each individual case.

detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.").

"The community caretaking doctrine gives officers a great deal of flexibility in how they carry out their community caretaking function." *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 75 (1st Cir. 2007) (citing *Rodriguez–Morales*, 929 F.2d at 785). As long as police are not investigating a crime, the Fourth Amendment imperatives stay intact, "so long as the procedure involved and its implementation are reasonable." *Id.* "Reasonableness does not depend on any particular factor; the court must take into account the various facts of the case at hand." *Lockhart-Bembery*, 498 F.3d at 75. Courts "must balance 'its intrusion' on [an individual's] substantial liberty interests in remaining in [his] home, against the defendants 'legitimate governmental interests' in minimizing the risk of harm to [an individual], the family members, and themselves" while performing their community functions. *Estate of Bennett v. Wainwright*, 548 F.3d 155, 172 (1st Cir. 2008) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989)).

The Court will first address whether there was a seizure of a person. Mr. Caniglia argues that it was unreasonable for the City to require him to go to the hospital for a mental health check. But "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968); *see also United States v. Smith*, 423 F.3d 25, 28 (1st Cir. 2005) ("In order

to find a seizure, ... we must be able to conclude that coercion, not voluntary compliance, most accurately describes the encounter."); *see also Lockhart-Bembery,* 498 F.3d at 75–76. The officer's insistence, even if viewed as an order, was not a seizure because Mr. Caniglia voluntarily left in the Cranston rescue.

But even if sending him to the hospital was a seizure, "a seizure does not violate the Fourth Amendment unless it is unreasonable under the circumstances." *Estate of Bennett,* 548 F.3d at 172 (citing *Skinner,* 489 U.S. at 619); *Ahern v. O'Donnell,* 109 F.3d 809, 816 (1st Cir. 1997). Here, the Court finds that a jury could not find that any of the individual officers' conduct in sending Mr. Caniglia for a mental health evaluation was unreasonable. Their response to the Caniglia home was not part of a criminal investigation and had no law enforcement investigatory purpose. Officers responded to a call from Mr. Caniglia's wife who was concerned about his mental and emotional well-being. Officer Mastrati believed Mr. Caniglia was a danger to himself. ECF No. 55 at ¶ 37. Sargent Barth considered Mr. Caniglia's statement to his wife to be a suicidal statement. ECF No. 55 at ¶ 38. Looking at the record as a whole, the officers had a legitimate safety concern for the Caniglia's at the time. *Lockhart-Bembery,* 498 F.3d at 76. There can be no dispute that sending Mr. Caniglia to talk to a mental health professional is a quintessential community caretaking function and was reasonable under these circumstances.

Regarding the seizure of the guns, there is no dispute that the officers knew the guns were legally possessed and did not suspect that they would uncover evidence of a crime so were acting solely in their roles as community caretakers. But

Mr. Caniglia argues that the officers' response in removing his guns was not reasonable because they knew he was not suicidal, Mrs. Caniglia knew he was not suicidal, the gun was not loaded when he brought it out during the argument, and most of the events that prompted their well-being check happened the day before so there was no emergency or reason remove the guns from the home.

The City argues that the officers' actions that day were reasonable based on their belief that the Caniglia's were in crisis. Mrs. Caniglia called police and told them about the previous days' argument that devolved into Mr. Caniglia putting a gun on the table and making a suicidal comment, that Mr. Caniglia was depressed, and that she was afraid and worried about her husband. Captain Henry believed that if the officers left Mr. Caniglia at his home with the guns, he, his wife, and their neighbors could potentially be in danger. ECF No. 55 at ¶ 42. The Court finds that the officers' conduct was reasonable under these circumstances. Could they have left the guns in the home pending Mr. Caniglia's clearance from Kent Hospital? Perhaps, but, "[t]here is no requirement that officers must select the least intrusive means of fulfilling community caretaking responsibilities." *Lockhart-Bembery*, 498 F.3d at 76 (citing *Colorado v. Bertine*, 479 U.S. 367, 373–74 (1987); *Rodriguez–Morales*, 929 F.2d at 786). Thus, the Court finds that the undisputed record supports its conclusion that the City and its officers were authorized by the community caretaking function to send Mr. Caniglia to Kent Hospital for a mental health evaluation and to seize his guns. The City's conduct did not violate Mr. Caniglia's rights under the Fourth Amendment.

Even if the Court were to find that the City were "mistaken in their judgment" and violated Mr. Caniglia's rights under the Fourth Amendment, the City argues that qualified immunity protects it from liability. *Estate of Bennett*, 548 F.3d at 172. Given these facts, the Court agrees. The Court will briefly review the legal standard for qualified immunity as it relates to Fourth Amendment analysis.

### 3. Qualified Immunity

"Qualified immunity[4] protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess—in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 22–24 (1st Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *see also Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009). A two-step inquiry requires the court to ask "(1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontánes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 243 (2009)). The second step has two prongs: a law is clearly established depending on (1) "the clarity of the law at the time of the alleged civil rights violation" and (2) "whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* The Court therefore

---

[4] An officer who is entitled to qualified immunity under federal law is similarly immune from suit for the state-law equivalent of that claim under Rhode Island law. *Estrada v. Rhode Island*, 594 F.3d 56, 63 (1st Cir. 2010) (citing *Hatch v. Town of Middletown*, 311 F.3d 83, 89–90 (1st Cir. 2002)).

must inquire "whether, at the time of the intrusion, Fourth Amendment jurisprudence signaled to the individual defendants in this case that their conduct overstepped constitutional boundaries." *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014).

When the First Circuit has considered whether the community caretaking function applies to searches and seizures in homes as well as cars, it observed that "the reach of the community caretaking doctrine is poorly defined outside of the motor vehicle milieu," that it "has not decided whether the community caretaking exception applies to police activities involving a person's home," and that the case law reveals that the scope and boundaries of the community caretaking exception are nebulous." *Id.* at 13-14. The First Circuit concluded that "neither the general dimensions of the community caretaking exception nor the case law addressing the application of that exception provides the sort of red flag that would have semaphored to reasonable police officers that their entry into the plaintiff's home was illegal." *Id.* at 15.

Because of this ambiguity, the Court finds that it is not clearly established that the community caretaking exception does not apply to police activity in the home intended to preserve and protect the public. *Gemma*, 818 F.3d at 32. Sending Mr. Caniglia for a voluntary well-being check and taking his guns for his and his family's safety were reasonable exercises of the officers' mandate. The City did not force Mr. Caniglia to go to the hospital and Mrs. Caniglia told police her husband had guns and allowed them to enter the home to take them. Nothing about those facts would have led police to believe they were violating Mr. Caniglia's clearly established

constitutional rights. The Court thus defers to the officers' reasonable decisions made in the line of duty and concludes that qualified immunity applies to bar this claim against the City.

The Court GRANTS the City's Motion for Summary Judgment (ECF No. 45) and DENIES Mr. Caniglia's Motion for Summary Judgment (ECF No. 43) as to Count III.

### B. Count II – Second Amendment of the United States and Rhode Island Constitutions

Mr. Caniglia's Second Amendment claim alleges that the City, through "a set of customs, practices, and policies," deprived him of his lawfully obtained and possessed weapons for no reason. ECF No. 51 at ¶¶ 73-74. The policy at issue is that the City will take an individual's weapons for safekeeping without a warrant if they believe that person may be a threat to himself or others. *Id.* at ¶ 27.

The United States Supreme Court announced in *D.C. v. Heller* that an individual has a right to possess firearms in his or her home for protection, but noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and thus does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" or "for any sort of confrontation." 554 U.S. at 595, 626 (2008) (emphasis omitted); *see also Worman v. Healey*, 922 F.3d 26, 34 (1st Cir. 2019).

Keeping this limitation in mind, the Court must consider whether the City's justification for taking Mr. Caniglia's guns comes within the scope of the Second Amendment's protection of the right to bear arms. If it does not, the inquiry ends.

15

"The issue is a sensitive one, as it implicates not only the individual's right to possess a firearm, but the ability of the police to take appropriate action when they are confronted with a firearm that may or may not be lawfully possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014).

Here, the Court finds that the City's policy of removing the guns from a home where an individual threatened suicide does not affect Mr. Caniglia's Second Amendment right to possess a gun. Just as the Second Amendment is not implicated when the police seize a firearm during an arrest, or at a crime scene, the Second Amendment is not implicated when the police reasonably seize a gun under their well-established duties as community caretakers. Moreover, it also is undisputed that the City eventually returned Mr. Caniglia's guns to him and that the City did not prevent Mr. Caniglia from buying or possessing any guns the incident in his home. ECF No. 55 at ¶¶ 46-48. The Court has found under similar facts that the Second Amendment does not protect an individual's right to possess a particular gun. *Richer v. Parmelee*, 189 F. Supp. 3d 334, 343 (D.R.I. 2016) (*Richer I*). The parties have presented no new case law or argument that persuades it otherwise.

The City's Motion for Summary Judgment (ECF No. 45) on Count II is GRANTED.

## C. Count IV – Fourteenth Amendment Due Process

Mr. Caniglia moves for summary judgment on his due process claim – the Court granted a similar motion for the plaintiff in *Richer I.* Mr. Caniglia alleges that

16

the City violated his due process rights when it seized his guns with no policy, custom, or procedure–with no process–for returning them.   The City refused to return Mr. Caniglia's property for four months and only did so after Mr. Caniglia repeatedly asked, had his lawyer send a letter, and ultimately sued.

The Fourteenth Amendment forbids the City from depriving "any person of life, liberty, or property, without due process of law."[5]   "In evaluating a procedural due process claim under the Fourteenth Amendment, we must determine 'whether [the plaintiff] was deprived of a protected interest, and, if so, what process was his due.'" *Garcia-Gonzalez v. Piug-Morales*, 761 F.3d 81, 88 (1st Cir. 2014) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).   The City held Mr. Caniglia's property for four months, which qualifies as a deprivation of his property right.   *See Fuentes v. Shevin*, 407 U.S. 67, 85 (1972) ("a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.").

The Court's analysis of this claim in the *Richer I* case is instructive here.   The Court focused on the process due and remarked that due process "is flexible and calls for such procedural protections as the particular situation demands." *Richer I*, 189 F. Supp. 3d 339 (quoting *Morissey v. Brewer*, 408 U.S. 471, 481 (1972)).   Relying on the *Mathews v. Eldridge* test, this Court noted the three relevant factors in determining what procedural protections are due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

---

[5] This constitutional right is actionable against state and municipal officials through 42 U.S.C. § 1983.

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Richer I*, 189 F. Supp. 3d at 339 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Analyzing the first factor, the Court held that the private interest in the "use and possession of property" ingrained in the Fourteenth Amendment trilogy "reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of government interference." *Richer I*, 189 F. Supp. 3d at 339 (quoting *Fuentes*, 407 U.S. at 81). The Court concluded based on *Fuentes* that "absent extenuating circumstances, due process requires a baseline of notice and an opportunity to be heard when chattels are to be confiscated." *Richer I*, 189 F. Supp. 3d at 340 (quoting *Fuentes*, 407 U.S. at 96).

First, the Court finds that Mr. Caniglia had a private interest in his personal property. Second, it is undisputed that the City took his personal property, did not afford him any notice of how to get his property back, and arbitrarily denied his requests for its return. Once in litigation, the City argues that the process Mr. Caniglia should have taken advantage of was to file a state court action under R.I. Gen. Laws § 12-5-7 to recover his property. But the burden on Mr. Caniglia to pay filing and service fees, to hire a lawyer, and wait for justice to ensue is too much of a barrier to his constitutional right to enjoy his property, "free from government interference." *Richer I*, 189 F. Supp. 3d at 339 (quoting *Fuentes*, 407 U.S. at 81).

Finally, the Court considers the City's interest, articulated here as the traditional community caretaking function of protecting the health and safety of the

public. The Court acknowledges that the City's officers were in a sensitive situation and acted within reason, trusting their law enforcement instincts to protect the Caniglia's by removing guns from a once volatile domestic situation that could again escalate once the police left. That said, once Mr. Caniglia left the hospital after being cleared by a doctor, a nurse, and a social worker, returned home to his wife, that exigency disappeared and without a reignition of that fight or evidence of domestic instability, the Court finds that Mr. Caniglia's interest in retaining his property outweighed the City's interest in keeping his guns away from him. *Richer I*, 189 F. Supp. 3d at 340; *Razzano v. Cty. of Nassau*, 765 F. Supp. 2d 176, 189 (E.D.N.Y 2011) ("once a person whose [guns] are taken has the opportunity to legally obtain and possess new [guns], the retention of that individual's old [guns] does not greatly protect the public from potential harm."). Because Mr. Caniglia has shown there is undisputed evidence that the City denied him due process, the Court GRANTS Mr. Caniglia's Motion for Summary Judgment (ECF No. 45) on Count IV.[6]

---

[6] On a side note, the Court feels compelled to address Mr. Caniglia's argument that the City's officers took the guns solely to cover all their bases so that they would not be subject to liability or public censure for leaving the guns in the home. While the Court finds that the facts and law justify the City's actions, his perceptions as a citizen provides all the more reason for the City to develop "a clear procedure ... about how to review and resolve the seizure and retention of guns." *Richer*, 189 F. Supp. 3d at 340. "Appropriate procedures initiated or noticed by the [City] would have eliminated the risk of such a lengthy deprivation without [plaintiff] having a meaningful opportunity to contest it." *Id.* The lack of any procedure violates notions of due process.

D. Count V – Equal Protection

The City moves for summary judgment on Mr. Caniglia's Equal Protection claim. In that claim, he alleges that he is entitled to injunctive relief against the City's policies, customs, and practices, which deprived him of his legal guns in violation of the Fourteenth Amendment. Because Mr. Caniglia fails in both his pleading and his presentation of any disputed material facts, his equal protection claim cannot survive.

"The equal protection guarantee of the Fourteenth Amendment prohibits the state from 'deny[ing] any person within its jurisdiction the equal protection of the laws.'" *Pagan v. Calderon*, 448 F.3d 16, 34 (1st Cir. 2006) (quoting U.S. Const. Amend. XIV, § 1). Equal protection has been interpreted to mean that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). "Plaintiffs claiming an equal protection violation must first identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in original) (internal quotation mark omitted). "Thus, the proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)).

Looking through the entire record, from the complaint through the summary judgment evidence, Mr. Caniglia does not point to any other individual similarly situated who was treated differently. He speculates that other gun owners could fall victim to the City's unconstitutional gun seizure policies and procedures, but fails to cite any specific cases. At this stage of the case, Mr. Caniglia's equal protection claim allegations are not enough to survive summary judgment. The Court GRANTS the City's Motion for Summary Judgment (ECF No. 45) on Count V.

Now the Court will discuss the motions made on Mr. Caniglia's state law claims.

### E. Count I – Rhode Island Firearms Act

The City moves for summary judgment on Mr. Caniglia's claim under the Rhode Island Firearms Act ("RIFA"), R.I. Gen. Laws § 11-47-22(b). Mr. Caniglia alleges that the RIFA limits the circumstances under which police can prevent individuals from possessing guns and the City's conduct violated the statute. To determine the exact violative conduct, the Court finds itself taking a circuitous route. He argues that the City took his guns under R.I. Gen. Laws § 11-47-6, which limits those "under guardianship or treatment or confinement by virtue of being a mental incompetent" from possessing a gun. He then argues that the City had no basis for taking his guns under this section, but also asserts that the City should have returned his guns under § 11-47-22(b) because the guns were not evidence of a civil or criminal matter. The City denies that it violated the RIFA when it took his guns.

The RIFA provides no further relief because the City returned Mr. Caniglia's guns to him. *Richer I*, 189 F. Supp. 3d at 343 (finding that the RIFA "only contemplates injunctive relief, and not damages.")   In the face of this truth, Mr. Caniglia argues that he is entitled to relief under R.I. Gen. Laws § 9-1-2 which "provides civil liability for criminal offenses" and a "plaintiff may recover civil damages for injury ... that results from the commission of a crime or offense, irrespective of whether charges have been filed against the offender." *Morabit v. Hoag*, 80 A.3d 1, 4 (R.I. 2013).   Mr. Caniglia asserts that "Defendants' unwritten policy of requiring persons whose guns they have seized to obtain an order in state court before they return them" is a criminal act.  ECF No. 51 at ¶ 69.  The assertion is not supported by the facts in this case though because it is undisputed that the City returned Mr. Caniglia's guns without a state court order.  The City did not violate the RIFA so he is not entitled to money damages under § 9-1-2.[7]

The Court therefore GRANTS the City's Motion for Summary Judgment (ECF No. 45) on Count I.

### F.  Count VI – Rhode Island Mental Health Law

Mr. Caniglia alleges that the Rhode Island Mental Health Law ("RIMHL") provides the processes through which state actors can require an individual to submit

---

[7] Even if there were a violation of the RIFA, "[t]he plain language of the statute [] requires a causal connection between the alleged crime and the claimed injury." *Kelly v. Marcantonio*, 187 F.3d 192, 203 n.8 (1st Cir. 1999).  Mr. Caniglia has failed to allege or produce evidence of a causal connection between the crime and his injury – presumably because he has his property back and he has no evidence of current injury.

to care for mental health issues; specifically, he argues that the statute dictates that before the state moves forward with having an individual admitted or certified to a medical or mental health facility, it must obtain a certification from a doctor that the individual needs immediate care. Because the City failed to get the certification and conspired to have him admitted to Kent Hospital for a mental health evaluation, Mr. Caniglia alleges that it violated the RIMHL.

Both parties move for summary judgment. The City argues it is entitled to dismissal because first, the RIMHL does not provide for a private right of action, and second, there is no evidence that the City attempted and/or conspired to have Mr. Caniglia admitted to Kent Hospital so no doctor certification was required. Mr. Caniglia concedes the first point but argues again that he has a cause of action for damages under R.I. Gen. Laws § 9-1-2. He also argues that that the City's agreement to send him to the hospital for a psychological evaluation is undisputed evidence of a conspiracy and it is irrelevant that he was not admitted.

Even if there is a private right of action, the scheme legislated in the RIMHL is not a fit here. The purpose of the RIMHL is "remedial. It was designed to establish a due-process framework for the commitment of mentally ill persons and for their periodic reevaluation." *In re Doe*, 440 A.2d 712, 716 (R.I. 1982). It is undisputed that the City did not seek emergency certification for Mr. Caniglia to a medical or mental health facility, but there is also no evidence in the summary judgment record that the City intended to or conspired to admit or commit Mr. Caniglia to Kent Hospital.

Moreover, the Court imagines that it is not unusual for police to send an individual to the hospital for an evaluation after being summoned by a family member to check on his or her well-being. The officers asked Mr. Caniglia to go with Cranston rescue to get checked out at Kent Hospital and he agreed to go. ECF No. 65 at ¶ 70. He was there for a brief time and then released by medical staff. There is no evidence that police officers had any contact with hospital staff during or after the evaluation to attempt or ensure his admission. Because the City has not violated the RIMHL, there is no crime so § 9-1-2 does not provide Mr. Caniglia any relief.

The Court GRANTS the City's Motion for Summary Judgment (ECF No. 45) and DENIES Mr. Caniglia's Motion for Summary Judgment (ECF No. 43) on Count VI.

### G. Count VII – Conversion

Both parties move for summary judgment on Mr. Caniglia's common law claim for conversion. In his complaint, he alleges that the City seized his guns without his permission, without legal justification, and retained them for several months despite his repeated requests that they be returned. The City objects and argues that the claim should be dismissed because the City's actions do not legally qualify as a conversion.

In an action for conversion, the Court focuses its inquiry on "whether the defendant has appropriated to his own use the chattel of another without the latter's permission and without legal right." *Terrien v. Joseph*, 73 R.I. 112, 53 A.2d 923, 925 (1947). "This intentional exercise of control over the plaintiff's chattel must 'so

seriously interfere[] with the right of another to control it that the [defendant] may justly be required to pay the other the full value of the chattel.'" *Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 97 (R.I. 2006) (quoting Restatement (Second) *Torts* § 222(A)(1) at 431 (1965)).  Essentially, a conversion forces a defendant to purchase the property by judicial sale. *Prosser and Keeton on Torts* § 15 at 90 (5th ed. 1984).

> To determine if a defendant has converted property, the Court should consider
>
> (a)   [T]he extent and duration of the actor's exercise of dominion or control;
> (b)   the actor's intent to assert a right in fact inconsistent with the other's right of control;
> (c)   the actor's good faith;
> (d)   the extent and duration of the resulting interference with the other's right of control;
> (e)   the harm done to the chattel;
> (f)   the inconvenience and expense caused to the other.

*Restatement (Second) of Torts* § 222A(2) (1965).  While the City kept Mr. Caniglia's property after a few months, there is no evidence that the City intended to assert any kind of ownership over the property; it removed the guns from the Caniglia home in its reasonable belief that it was in the interest of public safety, and there is no evidence that the property was damaged in any way.  And while the City's resistance to returning the guns inconvenienced Mr. Caniglia, this sole factor does not convince the Court that the City intended to convert his property.

The Court GRANTS the City's Motion for Summary Judgment (ECF No. 45) and DENIES Mr. Caniglia's Motion for Summary Judgment (ECF No. 43) on Count VII.

IV.    CONCLUSION

Well-being checks are an important part of the work of law enforcement, often putting officers in a position to invade the privacy of an individual's home to protect the health and safety of those inside and of the community as a whole.  Officers must strike a balance, however, between responding to a crisis and respecting the inviolate rights of community members.  Here, the Court determined from the undisputed material facts that the City operated within its duties to care for the community during the well-being check on Mr. Caniglia and his family.  The arm of the law, however, can only go so far into the zone of privacy guaranteed by the United States Constitution.  The City infringed on Mr. Caniglia's rights when it refused to return his property and failed to provide him with any process of how to get it back after his health and safety were secured.

Therefore, the Court GRANTS the City's Motion for Summary Judgment (ECF No. 45) as to Counts I, II, III, V, VI, and VII.  The Court GRANTS Mr. Caniglia's Motion for Summary Judgment (ECF No. 43) as to Count IV and DENIES it as to Counts III, VI, and VII.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

June 4, 2019