UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EDWARD A. CANIGLIA,<br>　　　Plaintiff | : <br> : <br> : | |
| v. | : <br> : | C.A. No. 15-525 |
| ROBERT F. STROM as the Finance Director of<br>THE CITY OF CRANSTON, et al.<br>　　　Defendants | : <br> : <br> : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS POST-REMAND MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE CITY OF CRANSTON**

Pursuant to F.R.Civ.P. 56, plaintiff Edward Caniglia hereby moves for partial summary judgment against the City of Cranston on the issue of liability.[1] Plaintiff asserts that the City is liable for the Individual Defendants' violations of Plaintiff's Fourth Amendment rights where they were following the City's unwritten policy, custom and practice of seizing firearms from homes without a warrant and its written policy and unwritten custom and practice of seizing people for psychological evaluations without a warrant or court order. Further, the City cannot obtain qualified immunity as a matter of law.

**STANDARD OF REVIEW**

With respect to summary judgment, this Court has previously said:

> Rule 56(a) of the Federal Rules of Civil Procedure directs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [citation omitted]. The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his [or her] favor. [citation omitted]. However, the non-moving party "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." [citation omitted]. A summary judgment motion cannot be defeated by "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." [citation omitted].

---

[1] Defendants' counsel indicated during a recent conference with the Court that the City may argue that it is not liable for the Individual Defendants' violations of Caniglia's rights.

1

Bank of Rhode Island v. Progressive Insurance Co., 19 F.Supp.3d 378, 385 (D.R.I. 2014). The fact that the parties may bring cross-motions for summary judgment does not change the standard of review. City of Providence v. Barr, 954 F.3d 23, 30-31 (1st Cir. 2020).

### I. THE CITY OF CRANSTON IS LIABLE FOR THE INDIVIDUAL DEFENDANTS' VIOLATIONS OF THE FOURTH AMENDMENT

#### SUMMARY OF THE ARGUMENT

The City of Cranston is liable for the Individual Defendants' violations of the Fourth Amendment where they were clearly carrying out the City's unwritten custom and practice of seizing firearms without a warrant and its written policy and unwritten custom and practice of compelling people to have psychological evaluations without a court order.

#### UNCONTESTED FACTS RESPECTING THE LIABILITY OF THE CITY OF CRANSTON AND RELEVANT PROCEDURAL HISTORY

Defendant Col. Winquist joined the Rhode Island State Police in 1990 after attending the State Police Academy. (SUF 1). Col. Winquist was told while with the State Police that he could require a person to submit to a mental health evaluation at a hospital emergency room without obtaining a court order if that person was in imminent danger of harming himself or someone else. (SUF 2). Moreover, Col. Winquist understood he had the authority in those circumstances to seize firearms without a court order to protect the public. (SUF 3).

Col. Winquist was told the police authority for these actions came from the community caretaking function. (SUF 4). The community caretaking function was not embodied in any written document nor was Col. Winquist taught any legal basis for the function. (SUF 5). Col. Winquist is not aware of any statute that embodies the community caretaking function. (SUF 6). There was no written policy or procedure that set forth the State Police's authority to seize firearms or to require persons to submit to psychiatric examinations without a court order. (SUF 7).

Winquist was involved in "ten or more" seizures of firearms "for safekeeping" while with the State Police. (SUF 8).

Defendants have General Orders ("GO") that constitute the Cranston Police Department's ("CPD") "complete catalog" of policies and procedures. (SUF 9-10). It is the CPD's "bible." (SUF 11). The CPD's GO 320.70 addresses "Mental Health." (SUF 12-13 and Exhibit 2). It purportedly authorizes CPD officers to compel people to have an "involuntary" psychological evaluation, including when "[t]he person is in clear and imminent danger of causing personal harm to him/herself or others." (Id. p. 3).

The CPD was sued in 2012 for seizing a person's firearms from his home for "safekeeping" without a warrant. Machado v. The City of Cranston, C.A. No. 2012-445 (D.R.I. 2012). (SUF 14). In that case, the CPD also required the plaintiff to have a psychological evaluation without a court order. That case settled without a decision on the legal issues.

Col. Winquist was with the State Police until 2014 when he was hired to be the Colonel (highest ranking officer) of the Cranston Police Department. (SUF 15). Col. Winquist is the person who establishes policy for the CPD. (SUF 16). Under Winquist, the CPD continued its custom and practice of seizing people for psychological evaluations and seizing their firearms without court orders. (SUF 17). The CPD and the Individual Defendants relied on the community caretaking function to justify the subject seizures. (SUF 18-19). The CPD's policy and practice authorized the officers on the scene to require people to have psychological evaluations and to seize firearms for "safekeeping." (SUF 20).

In 2015, Capt. Henry was acting captain in charge of the day patrol. (SUF 21). He believed that there was no limit on the police authority under the community caretaking function so long as it is not used to collect evidence to prosecute a crime. (SUF 22). He understood the function

3

authorizes police to take whatever steps are reasonable based on the facts and circumstances at the time.  (SUF 23). There were no written guidelines to help a police officer determine whether he has the authority to act pursuant to the community caretaking function. (SUF 24).  Capt. Henry was not aware of any training for Cranston police officers on the scope of their authority under the community caretaking function.  (SUF 25).

Capt. Henry did not go to Caniglia's house on August 21, 2015. (SUF 26).  Rather, it was CPD policy that a supervisor makes the decision to seize firearms. (SUF 27).  The officers on the scene called Capt. Henry and he decided to seize Caniglia's firearms based on the recommendation of those officers. (SUF 28-29).  Capt. Henry testified that it did not matter whether Caniglia objected to the seizures; regardless, the Defendants were going to seize his firearms and require him to have a psychological evaluation.  (SUF 30).

Sgt. Barth was the senior CPD officer present at Plaintiff's house on August 21, 2015. (SUF 31). He made the decision to seize Caniglia for the psychological evaluation. (SUF 32). Sgt. Barth based his authority to send someone for a psychological evaluation on the "Community Care Doctrine." (SUF 33). Sgt. Barth also said that Mr. Caniglia was transported for an "involuntary emergency psychiatric evaluation" under GO 320.70. (SUF Exhibit 2, p. 3 and SUF 34). Sgt. Barth has required people to go for mental evaluations "[m]ore times than [he] can count."  (SUF 35).

Officer Smith was one of the other CPD officers on the scene at Caniglia's house, along with Officers Mastrati and Russell. (SUF 36). Smith said he has been involved in about ten incidents in which the CPD seized firearms for "safekeeping." (SUF 37). Officers Mastrati, Smith, and Russell asserted in their answers to interrogatory no. 6 that their seizures of Plaintiff's firearms were pursuant to the CPD's "custom and practice prior to November 2015." (SUF 38 and Exhibits 4B, 4C, and 4D, respectively). When Caniglia spoke with the officers on his deck, they said "in

4

these situations, we seize the firearms." (SUF 39). When Caniglia asked them "don't you need a warrant?" they responded, "not in these situations." (SUF 40).

In 2015, Maj. Quirk was one of two majors in the CPD who reported directly to Col. Winquist. (SUF 41). He testified the CPD had a policy or practice of seizing firearms for safekeeping. (SUF 42). He set forth the practice in his answers to interrogatories. (SUF 43 and Exhibit 4A). Similarly, Quirk testified that, until November 2015, the CPD had a custom or practice of requiring people whose firearms were seized for safekeeping to get a court order for the return of the firearms. (SUF 44). This was a "long-standing practice." (SUF 45).

The same attorneys are representing the City of Cranston and the Individual Defendants in this action. The City has adopted an ordinance that provides it:

> [S]hall protect and hold harmless any…appointed official…from financial loss, expense and damage, including any legal fees and costs…arising out of any claim, action, compromise, settlement, or judgment by reason of any negligence or by any…violation of the rights of any person under any federal or state law, including misfeasance, malfeasance or nonfeasance or any act…which imposes personal liability on any…appointed official…if said individual…was acting within the scope of his or her official duties or employment. (emphasis added).

Ord. 05-10, § 1. (SUF 46 and Exhibit 13). Similarly, the contract between the City and the union for its police officers has a provision that provides:

> In the event any employee covered by this Agreement is sued in any civil proceeding as a result of actions performed by said employee in the performance of his/her duties as an employee of the Cranston Police Department, the City of Cranston agrees to provide such employee with all necessary legal assistance and further agrees to pay any judgment rendered against such employee in any such proceeding; provided, however, that the City shall have the right to deny all or a portion of the benefits under this section if it determines that the employee acted outside the scope of his/her employment. (emphasis added).

(SUF 47 and Exhibit 13).[2]

---

[2] Plaintiff obtained the ordinance and the contractual provision in response to an Access to Public Records Act request. Plaintiff subsequently asked Defendants to stipulate that the City

5

The City and the Individual Defendants previously moved for summary judgment arguing that the seizure of the firearms was justified by the community caretaking function. (ECF 45-1, pp. 13-25). The City did not argue that it was not liable for the Individual Defendants' actions. This Court held that the community caretaking exception justified the search of Caniglia's house and the seizures of both him and his firearms without a warrant. Caniglia v. Strom, 396 F.Supp.3d 227, 235 (D.R.I. 2019 ("Caniglia I"). The Court also held all Defendants were entitled to qualified immunity. Caniglia I, 396 F.Supp.3d at 236.

On appeal, the City argued that the community caretaking exception justified both the seizures of Caniglia and of his firearms. (Defendants' Brief, pp. 10-32). The First Circuit upheld this Court's decision that the community caretaking exception applied to both seizures. Caniglia v. Strom, 953 F.3d. 112, 139 (1st Cir. 2020) ("Caniglia II"). It commented that the City and the officers in their official capacities were not entitled to qualified immunity as a matter of law but otherwise said it need not reach the issue of the Defendants' qualified immunity because it held they did not violate Plaintiff's rights under the Fourth Amendment based on the community caretaking exception. Caniglia II, 953 F.3d at 121, n. 3.

Before the Supreme Court, the City again argued that the community caretaking exception justified both seizures. (Defendants' Brief, *passim*). The Supreme Court overturned the First Circuit's holding respecting that exception but did not reach the issue of qualified immunity. Caniglia v. Strom, 141 S.Ct. 1596, 1600 (2021).

---

was defending and indemnifying the Individual Defendants in this action. They declined to stipulate. On August 6, 2021, Plaintiff served requests for admission on Defendants on that issue as well as the authenticity of the ordinance and the contractual provision. On September 2, 2021, Defendants filed a motion for a protective order seeking not to respond to the requests.

6

**ARGUMENT**

I. **THE CITY IS LIABLE FOR THE VIOLATIONS OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS WHERE THE INDIVIDUAL DEFENDANTS WERE CARRYING OUT THE CITY'S WRITTEN POLICY AND UNWRITTEN PRACTICES**

The City of Cranston is liable for the Individual Defendants' violations of Plaintiff's Fourth Amendment rights where its police officers were carrying out the City's policies or customs. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-91 (1978). In Monell, the Supreme Court held that municipalities could be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury…" 436 U.S. at 694. These policies or customs can be unwritten.  City of Canton, Ohio v. Harris, 499 U.S. 378, 398 (1989); Farry v. City of Pawtucket, 725 F.Supp.2d 286, 295-96 (D.R.I. 2010) (Smith, J.). Similarly, a custom can give rise to municipal liability when "the practice is so widespread as to have the force of law."  Board of County Commissioners v. Brown, 520 U.S. 397, 404 (1997).

Plaintiff can show a custom or unwritten policy of Fourth Amendment violations through evidence of (1) a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct; and (4) the defendant's custom was the moving force or direct causal link to the constitutional deprivation. Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).  "If a police officer says there is a policy, that allegation may be enough to plausibly suggest that the policy exists, even if the plaintiff can plead only one specific instance of conduct.  If the police officer says he or she was told to do something down at the stationhouse, that allegation, too, may be enough." Ward v. City of Hobbs, 398 F.Supp.3d 991, 1042 (D.N.M. 2019).

It is clear the Individual Defendants were carrying out the City's unwritten practice or custom of seizing firearms and its written policy and its unwritten custom or practice to require people to submit to psychological evaluations without warrants or court orders. First, Col. Winquist, who establishes policy for the CPD, confirmed his training as a long-time member of the Rhode Island State Police to seize firearms and people without warrants or court orders when the people were supposedly an imminent threat to themselves or others. (SUF 2-3). He understood the community caretaking function permitted this. (SUF 4).

The CPD followed this practice even before Winquist took over leadership of the department. Indeed, the City was sued in 2012 for these practices. Machado v. The City of Cranston, C.A. No. 2012-445 (D.R.I. 2012). (SUF 14). According to Winquist, the CPD seizes a person's firearm for "safekeeping" when that person is in a "crisis or an imminent threat to themselves." (SUF 17). Winquist testified that the CPD's policy empowers the officers on the scene to seize firearms and require people to have psychological evaluation without a warrant or court order. (SUF 20). Winquist believed that the CPD had this authority pursuant to the community caretaking function. (SUF 19).

Sgt. Barth testified that he based his authority to require people to have psychological evaluations on the "Community Care Function" as well as GO 320.70. (SUF 33-34). He has required people to have psychological evaluations "more time than [he] can count." (SUF 35). Officer Smith testified he had been involved in similar seizures of firearms for "safekeeping" about ten times (SUF 37). Officers Mastrati, Smith, and Russell said in their answers to interrogatory no. 6 that their actions in seizing Plaintiff's firearms for "safekeeping" were pursuant to CPD custom and practice. (SUF 38 and Exhibits 4B, 4C, and 4D). Defendants told Caniglia that in "these

8

situations" they "seize the firearms." When he asked them "don't you need a warrant?", they responded "not in these situations." (SUF 40).

The officers on the scene called Capt. Henry for approval to seize Caniglia's firearms. This call was pursuant to the CPD's unwritten policy that a supervisor make the decision. Capt. Henry approved the seizure.

Maj. Quirk testified the CPD of had a policy or practice and procedure of seizing firearms for safekeeping. (SUF 42). He set forth the practice in his answers to interrogatories. (SUF 43 and Exhibit 4A). Similarly, Quirk testified the CPD had a custom or practice of requiring people whose firearms were seized for safekeeping to get a court order for the return of the firearms. (SUF 44). This was a "long-standing practice." (SUF 45).

Thus, it is undisputed that the CPD chief, Col. Winquist, and at least two of his top deputies, Maj. Quirk and Capt. Henry, knew of and approved the CPD practice of seizing firearms from people for "safekeeping," without warrants, seizing people for involuntary psychological evaluations, without court orders, and requiring people to get court orders for the return of their firearms. Every Individual Defendant confirmed the practice of seizing firearms for safekeeping without warrants. Sgt. Barth said he has required people to have psychological evaluations more time than he can count. The policy of requiring people to have psychological evaluations is enshrined in a CPD General Order. Not only did Winquist, Quirk, and Henry know of these practices but they approved of and participated in them. These customs, practices and policies directly resulted in the deprivation of Caniglia's Fourth Amendment rights. Accordingly, there is abundant evidence based on Defendants' own testimony that the seizures of Caniglia and his firearms were part of an unwritten practice or custom of the City's police department.

Further, it is undisputed that the City has been providing the Individual Defendants with the same defense counsel who are representing the City and it is likely that the City will be indemnifying the Individual Defendants for any liability that they may incur.  Evidence that a municipality indemnifies police officers for Fourth Amendment violations supports an argument that the violations constitute a custom of the municipality.  See Figueroa v. Gates, 207 F.Supp.2d 1085, 1100-01 (C.D.Cal. 2002).  Similarly, municipal liability may also attach when a final policymaker ratifies both a subordinate's unconstitutional action and the subordinate's basis for that action.  Id. at 1101, citing City of St. Louis v Praprotnik, 485 U.S. 112 (1988).  The City's decision to defend and indemnify the Individual Defendants ratifies their unconstitutional actions.

## II. THE CITY CANNOT RELY UPON THE DOCTRINE OF QUALIFIED IMMUNITY TO AVOID LIABILITY AS A MATTER OF LAW

The City of Cranston is not protected by qualified immunity as a matter of law. Owen v. City of Independence, Missouri, 445 U.S. 622, 638 (1980) ("[T]here is no tradition of qualified immunity for municipal corporations, and neither history nor policy supports a construction of §1983 that would justify the qualified immunity accorded the city of Independence by the Court of Appeals."). Similarly, the First Circuit noted in this case that "[q]ualified immunity…offers no refuge either to the City or to the officers in their official capacities. See, Haley v. City of Boston, 657 F.3d 39, 51, (1st Cir. 2011); Neveida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993)." Caniglia II, at 121, n.3.

In Haley, the First Circuit cited Owen and added: "Furthermore, claims of this nature [against the City of Boston] are measured under current law, without regard to whether the municipality's legal obligations were clearly established when the alleged malfeasance occurred." 657 F.3d at 51.  It held the City could be held liable even if some claims against the individual defendants were barred by qualified immunity.  Id. at 53.  Similarly, here, Caniglia's claims against

10

the City of Cranston for violation of his Fourth Amendment rights can go forward regardless of the Individual Defendants' asserted defense of qualified immunity.[3]

## CONCLUSION

For the reasons set forth here, or incorporated herein by reference, the Court should grant Plaintiff's post-remand motion for partial summary judgment on liability for deprivation of Plaintiff's rights under the Fourth Amendment of the United States Constitution.

        **EDWARD CANIGLIA**
        By his attorneys,

        */s/ Thomas W. Lyons*
        Thomas W. Lyons    #2946
        Rhiannon S. Huffman    #8642
        Strauss, Factor, Laing & Lyons
        One Davol Square, Suite 305
        Providence, RI 02903
        (401) 456-0700
        tlyons@straussfactor.com

Of counsel,
Lynette Labinger, #1645
128 Dorrance Street, Box 710
Providence, RI 02903
(410) 465-9565
ll@labingerlaw.com

Cooperating attorneys,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF RHODE ISLAND

---

[3] In Neirda-Gonzalez v. Tirado-Delgado, the First Circuit held that suits against government officials in their official capacities for equitable relief were not subject to qualified immunity. 990 F.2d at 705. Here, because Caniglia's Second Amended Complaint seeks declaratory and injunctive relief against all the Defendants respecting their unconstitutional practices of seizing firearms and requiring people to have psychological evaluations without court orders, (Second Amended Complaint, p. 16), those official capacity claims against the Individual Defendants are similarly not subject to their asserted defense of qualified immunity.

11

## **CERTIFICATION**

I hereby certify that on September 7, 2021, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons